J-S64016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.M.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.B., FATHER | No. 1173 MDA 2015 |

Appeal from the Order Entered on May 20, 2015
In the Court of Common Pleas of Bradford County
Orphans' Court at No.: 34 Adopt 2014

| | |
|---|---|
| IN RE: S.L.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.B., FATHER | No. 1174 MDA 2015 |

Appeal from the Order Entered on May 20, 2015
In the Court of Common Pleas of Bradford County
Orphans' Court at No.: 33 Adopt 2014

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED NOVEMBER 02, 2015**

M.L.B. ("Father") appeals the May 20, 2015 order that terminated his parental rights to A.M.H. (born in May 2011) and S.L.H. (born in May 2012) (collectively "Children").  We affirm.

On June 28, 2013, the Bradford County Children and Youth Services ("CYS") filed for emergency custody of Children.  On July 8, 2013, they were

---

[*]     Former Justice specially assigned to the Superior Court.

adjudicated dependent. At the time of the adjudication, Father and J.L.H. ("Mother") had been evicted and were unable to find suitable housing, Father had failed a drug test, and domestic violence had occurred in the presence of Children. Nonetheless, Children were returned to Mother's care because Mother had obtained housing and Father was in jail. The case then was closed for a brief period between July 18 and August 28, 2013, when CYS obtained emergency custody again. On September 10, 2013, Children were adjudicated dependent for a second time. At that time, Mother had been evicted again and Mother and Father both were incarcerated.

At the first permanency review hearing, on November 20, 2013, the trial court found that Mother and Father had made substantial compliance with their goals because Mother and Father had obtained housing and had attended most of Children's doctor appointments. However, at the next hearing on February 26, 2014, Father had no compliance because he had been incarcerated for assaulting Mother, and had tested positive for marijuana, opiates, and alcohol. On June 11, 2014, the court again found that Father had no compliance with his goals beacuse he had not had any contact with CYS, CYS was unaware of his whereabouts, and the last known information was that Father had run away from an inpatient drug and alcohol treatment facility. Father also had violated his probation.

On September 5, 2014, the trial court found that Father had been incarcerated, but had not requested visitation and had not completed any of his goals. On March 13, 2015, Father still had not made any progress. He

- 2 -

had not been in contact with CYS for visits and had not contacted Legal Aid for an attorney, despite being instructed to do so. Father had not had contact with Children since June 2014.

On December 18, 2014, CYS filed a petition to terminate Father's and Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). On May 20, 2015, the trial court held a hearing on the termination petition. Mother did not appear. Father, who was residing in Indiana at the time of the hearing, appeared by telephone. At the conclusion of the hearing, the court terminated Mother's and Father's parental rights.[1]

The trial court summarized the proceedings as follows:

At the outset of the hearing, Father's attorney requested that the proceeding be continued on the basis of Father's claim that he wanted to be a part of the Children's lives and he needed additional time to accomplish this. [CYS] and the Children's guardian *ad litem* objected to Father's request for a continuance because, as they stated, the Children had been in placement for nearly two years and also because Father had notice of the proceeding on March 9, 2015, more than two months prior to the hearing date. The court denied Father's request for a continuance of the hearing for the reasons that, given the length of time the Children had been in placement, it would not have been fair to the Children to delay the hearing, and the court's finding that a continuance would serve only to delay the proceeding.

Joanne Babcock was the [CYS] caseworker assigned to the Children's dependency case. Ms. Babcock testified that the

---

[1] Mother has not appealed the termination of her parental rights.

Children were adjudicated dependent on September 10, 2013, and that they were placed in foster care with [Foster Parents] at that time. She also informed the court that the Children had, on July 8, 2013, been placed with [Foster Parents] . . . . Additionally, the court learned from Ms. Babcock that at the time of the placement that occurred on September 10, 2013, Father and Mother were, she believed, homeless [and] the Children were living with Mother's biological father in a home that turned out to be a "meth lab."

Ms. Babcock's testimony revealed that, around the time of the dependency petition and subsequent dependency adjudication, Father was incarcerated after having been kicked out of one court-ordered Halfway House Rehabilitation Program and failing to complete another similar program to which he had been sentenced by an unidentified court. According to Ms. Babcock, Father was offered the opportunity to visit the Children while he was at the halfway houses, but there is no record of his having responded to the offer one way or the other.

According to Ms. Babcock, on or about June 27, 2014, Father and Mother were both remanded to the Bradford County Correctional Facility and, on July 7, 2014, during a visit by Ms. Babcock, Father signed a letter stating that he did not want to visit with the Children while he was in prison. Ms. Babcock related that Mother then was involved in a succession of treatment programs and rehab houses and [CYS] provided transportation for the Children to her location so that she could have visitation with them. However, Ms. Babcock's records, as she explained to the court, showed that after Mother's release from treatment in approximately mid-November 2014, visitation by Mother was inconsistent.

In December 2014, continued Ms. Babcock, Mother was charged with Driving Under the Influence of Alcohol ("DUI"), by an unnamed agency, and voluntarily entered a treatment program; apparently the DUI charge is still pending.

\* \* \*

Ms. Babcock's records indicated that Father's last visit with the Children was on June 27, 2014, prior to his incarceration. Father was discharged from incarceration and placed on parole around the third week of December 2014. Father's parole plan provided that he would reside with his mother in the State of Indiana and, to Ms. Babcock's knowledge, Father was residing in that state at

the time of the termination hearing and had made no attempt to establish a plan for visitation of the Children or to inquire into their welfare.

Ms. Babcock went on to inform the court that the Family Service Plan created in the case required Father to attend medical and dental appointments, but he has not done so. Ms. Babcock noted that [CYS] requested both Father and Mother to sign certain releases pertaining to the requirements of the Family Service Plan and that, as of the date of the hearing, neither parent had complied with the request.

Additionally, and notwithstanding the mandates of the Family Service Plan, Ms. Babcock disclosed that [CYS] records reveal that, up to the time of the hearing, neither party had attended BLAST[2] appointments or well-check visits scheduled for the Children. Moreover, as evidenced by [CYS] records in the possession of Ms. Babcock, Mother has not attended domestic violence counseling as required nor has she completed the mandated psychological evaluation.

When asked by Counsel to provide insight into the relationship existing between the Children and [Foster Parents], as she believed it to be, Ms. Babcock testified that the Children are fully integrated into the [Foster Parents' family,] which includes the three biological children of the [Foster Parents], that the Children refer to the [Foster Parents] as "mommy" and "daddy"; and that the Children refer to Mother as ["J."] despite her demand that they call her "mommy" or "momma." Ms. Babcock's testimony in this regard included her observations that the [Children] consider the [Foster Parents'] children to be their sisters and brothers, that they consider the [Foster Parents'] home to be [their] home. The court found Ms. Babcock's revelation that the Children have never asked her about or even mentioned Father and Mother to her to be very significant.

_____

[2] "BLAST is an intermediate unit that provides [various] levels of early intervention services," including "physical therapy, speech, occupational therapy, or general development [therapy]." Notes of Testimony, 5/20/2015, at 75. The services Children received were provided in their foster placement.

Equally significant, in the opinion of the court, were Ms. Babcock's disclosures that she had personally gone over the Family Service Plan with Father in July of 2014 while Father was incarcerated in the Bradford County Correctional Facility, and that following the meeting, she had sent both Father and Mother copies of the Family Service Plan together with a note stating that if they had any questions about the plan, they should contact her at the number shown on the note.

Ms. Babcock further testified that during the year preceding the termination hearing, Father has shown no real interest in the Children. Her testimony included revelations that she had had only two contacts, via telephone, with Father since the beginning of 2015 and that during the ensuing conversation Father asked her only about hearing dates and never inquired [about] how the Children were doing. Ms. Babcock then opined that Father has had a long time to step-up and to show any kind of parenting concern for the Children, but that she has not seen any such effort and she believed that it would never happen.

The court also heard from Mr. Robert Meacham, a licensed psychologist. An evaluation report prepared by Mr. Meacham, dated March 12, 2015, was received by the court as an exhibit; the report was subsequently entered as evidence in the case. In establishing a foundation for his report, Mr. Meacham informed the court that the report was based upon his personal observations of the Children, [Foster Parents], and Mother. Mr. Meacham advised that he did not have any contact with Father.

Mr. Meacham explained to the court that the purpose of the evaluation was to assess the developmental progress of the Children, to determine the degree of the bond, if any, existing between the Children and the [Foster Parents,] and to ascertain the advisability of permanent placement of the Children with [Foster Parents].

When asked to comment upon the developmental progress of the Children since being placed with the [Foster Parents,] Mr. Meacham stated that, in his opinion, the Children had made "huge progress." Mr. Meacham went on to inform the court of his observation that since entering foster care in the [Foster Parents'] home, the Children had gone from a pattern of "primitive behavior," including search[ing] for food in trash cans and limited capacity of expression, to higher levels of personal functioning.

Mr. Meacham also testified that he had detected an emotional bond between the Children and the [Foster Parents] but the Children showed no evidence of any continuing bond [with] the natural parents. The current placement of the Children with the [Foster Parents] was described as "wonderful" by Mr. Meacham and he gave his professional opinion that termination of parental rights in the instant matter would not be detrimental to the emotional well-being of the Children. When queried about the potential effect upon the Children that would result from continuing attempts to reunite the Children with the natural parents, Mr. Meacham replied that he believed that "breaking the bond with [Foster Parents]" would create the risk of "significant trauma" to the Children. Mr. Meacham also expressed his feeling that continued contact with Father and Mother could cause emotional harm to the Children.

Father testified at the termination hearing by telephone. According to threshold testimony received from Father, he is 26 years old and is currently living in the state of Indiana with his [mother,] having moved there following his release from incarceration sometime around the end of 2014. Father's initial testimony also revealed that he had come to Pennsylvania to work with a gas extraction company. Father admitted that he had signed a letter explaining that he did not want to see the Children while he was incarcerated, explaining that he felt that it would not have been beneficial to the Children to see him in jail. However, Father claimed that he had visited them once a week for about two months prior to being incarcerated, "a lot more than three visits."[2] Father's testimony indicated that he has had no contact with the Children, including telephonic contact, since being released from incarceration but, he asserted, he and his mother had sent them cards and gifts "on their birthdays and the major holidays, and Christmas and Thanksgiving."

[2] [CYS] claim[ed] that Father visited the Children only three times prior to his being incarcerated.

In response to counsel's question as to what steps he has taken to see the Children since being released from incarceration, Father replied that he and his mother contemplated establishing a visitation program and that his mother had attempted to arrange with [CYS] for visitation. Father went on to explain to counsel that, notwithstanding phone calls between his mother and [CYS] during which visitation was discussed, no visitation plan was formulated. Additionally, Father testified that he has

not taken any steps to establish a visitation plan. He stated that even if a visitation plan had been arranged, he could not have afforded the expenses of traveling from [] Indiana to Pennsylvania as he has not yet obtained employment. When queried by counsel as to what steps he had taken to see the Children since he had been out of jail, Father answered that "it kind of fell through the cracks – I guess I didn't."

The court learned from Father's testimony that he has not tried to contact the [Foster Parents] about the Children as he didn't feel that it was appropriate to call them. Additionally, Father testified that the last time he and his mother had sent a card to the Children was two weeks prior to the hearing.

In response to questions posed by counsel, Father informed the court that he wants to play a role in the lives of the Children. Significantly, Father stated that he agreed with counsel that removing the Children from placement with the [Foster Parents] would probably not be in their best interest.

On cross examination by [CYS,] Father admitted that he had not signed a release, as requested by [CYS] to enable [CYS] to obtain his counseling records in [] Indiana.

Father acknowledged to counsel for the Children that he last saw the Children on June 27, 2014. In connection with that testimony, he again claimed that he keeps in contact with the Children through his mother. Counsel for the Children also elicited testimony from Father establishing that Father had been incarcerated in the Bradford County Correctional Facility from June 29, 2014, through December 24, 2014, and that he is still under court supervision for a felony conviction.

Additional questioning revealed that as part of his Bradford County sentence, he had been ordered to undergo alcohol-related treatment at a halfway house, that his treatment had been terminated on the basis of suspected alcohol consumption, and that because of his failure to complete the treatment plan, he was returned to the Bradford County Correctional Facility. Questioning by the court led to the disclosure by Father that he had met Mother while attending school in [] Indiana and that Mother had come to Pennsylvania with him when he obtained employment with a gas extraction company. Father denied that he has a drug or alcohol problem but admitted that he had consume[d] alcohol in [] Indiana. Father disclosed, as well, that since returning to Indiana, he has served a period of

incarceration relating to non-payment of fines having to do with a conviction for theft in Indiana, this conviction resulted in incarceration for a period of one month. Father did not notify [CYS] of the conviction and jail term.

Finally, [CYS] called as a rebuttal witness, [Foster Parent. Foster Parent] acknowledged that the Children have been in his home continuously since September 10, 2013. He also stated that he has received some gifts and telephone calls from Father's mother, that the Children received a card from Father around the Christmas holiday, that the Children have received birthday cards bearing the return address of Father's mother, and that the cards have been signed as being from [Father's mother] and Father, but that both signatures were in the same handwriting. In response to questions from [CYS] counsel, [Foster Parent] allowed that he had received a few phone calls from Father's mother, but that no telephone calls had been received from Father.

Trial Court Opinion ("T.C.O."), 8/5/2015, at 2-13 (citations to record and some footnotes omitted; minor modifications to punctuation and capitalization).

After the hearing, the trial court terminated the rights of both parents. The trial court found that CYS had met its burden with respect to all four subsections of 2511(a).[3] On June 18, 2015, Father filed notices of appeal and concise statements of errors complained of on appeal pursuant to

---

[3] On the record, the trial court found that all four subsections had been proven. Notes of Testimony, 5/20/2015, at 131. However, the May 20, 2015 order only reflects findings for subsection (a)(2), (5), and (8).

Pa.R.A.P. 1925(a)(2)(i) and (b) for each child.[4]  On August 5, 2015, the trial court filed its Pa.R.A.P. 1925(a) opinion.

Father raises two issues for our review:

1. Was there sufficient evidence to establish the termination of Father's parental rights?

2. Was the termination of Father's parental rights proper, without the consideration of an Interstate Compact?

Father's Brief at 4.

Our standard of review in termination of parental rights cases is as follows:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions.  However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

> We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible

_____

[4]  By order dated July 29, 2015, this Court *sua sponte* consolidated the appeals.

evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by clear and convincing evidence, which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511, which states, in pertinent part, as follows:

**(a) General rule. –** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations. –** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

The trial court found grounds to terminate Father's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). However, this Court only needs to agree with the trial court's conclusions with regard to one subsection of 23 Pa.C.S.A. § 2511(a), in addition to section 2511(b), in

order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Termination is a two-step process, in which a trial court first must determine if the grounds under subsection (a) are met, and then it must consider subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). The focus in terminating parental rights under section 2511(a) is upon the parent, while section 2511(b) focuses upon the child. *Id.* at 1008. None of Father's arguments in his brief challenge the trial court's findings regarding Children's best interest pursuant to subsection (b), so we focus solely upon subsection (a).

Because we need only find that there was clear and convincing evidence as to one subsection of 2511(a), we examine section 2511(a)(2).

> The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). Nevertheless, parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* at 340. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.*
>
> The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 331 A.2d 172 (Pa. 1975). There the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or

subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998).

*In re Adoption of K.J.*, 936 A.2d 1128, 1132-33 (Pa. Super. 2007) (citation modified).

> In the case of an incarcerated parent, the fact of incarceration alone does not provide sufficient grounds for the termination of parental rights. Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and to take affirmative steps to support a parent-child relationship. *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999). As such, a parent's responsibilities are not tolled during incarceration. *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* "[A] parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill . . . parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.* at 856.

*Id.* at 1133 (some citations modified; other citations omitted). Further,

> we must inquire whether the parent has utilized those resources at his or her command while in prison to continue and pursue a close relationship with the child or children. An incarcerated parent desiring to retain parental rights must exert him- or herself to take and maintain a place of importance in the child's life.

*In re R.I.S.*, 36 A.3d 567, 573 (Pa. 2011) (citation omitted).

Father argues that he made efforts to be involved in Children's lives. Father claims that he attended visitation through CYS and sent cards and gifts to Children while they were in foster care. Father contends that CYS

should have done more to provide him with services and to reunite him with Children. Father's Brief at 8-12.

The trial court found that Father may wish to become involved in Children's lives, but that he has made minimal or no attempt to actually maintain contact with Children. The trial court found Ms. Babcock's testimony that Father had a minimal amount of visitation prior to his incarceration to be credible. Similarly, Father has made "little or no effort" to see Children since his release from jail. T.C.O. at 14. The trial court found that Father's mother "has been the driving force behind any contact with the Children and that Father has expended virtually no effort in attempting to visit or contact the Children." *Id.* at 15.

The evidence supports the trial court's conclusions. Here, the evidence demonstrates that Father has refused to parent Children, causing them to be without parental care, and that the situation is unlikely to be remedied. Father has not seen Children since June 2014. The evidence supports the finding that he had only three visits with Children before he was incarcerated. Ms. Babcock testified that, at those visits, Father seemed disinterested and was disengaged from Children. Notes of Testimony ("N.T."), 5/20/2015, at 52. Although Father may have had Children's best interests in mind in refusing to have visitation with them at the jail, there is no evidence that Father took any steps to maintain contact with Children by other means, with the exception of two cards purportedly sent by Father.

Father did not exert himself in attempting to maintain a relationship with Children. The cards and letters to Children mainly were sent by Father's mother in Indiana. When Father was released from jail, he made no attempts to contact CYS or to establish visitation. Father admitted that he had not asked for telephone contact with Children, that he had not asked CYS how Children were doing, and that he never signed the releases that CYS had requested. *Id.* at 92-93. Father admitted that any efforts to establish visitation were made by his mother and not by him. *Id.* at 94. Father simply has shown no interest in acting as a parent for Children until the day of the termination hearing. The record supports the trial court's conclusion that Father has refused to parent Children and that the situation is unlikely to change. Therefore, the trial court did not err in terminating Father's parental rights.

Father next asserts that the trial court erred in terminating his parental rights without CYS considering an interstate compact. Father notes that the Interstate Placement of Children Act, 62 P.S. § 746 *et seq.*, provides for placement of children in different states. Father asserts that an interstate compact would have permitted Children to be placed with him in Indiana. Father contends that it was error for the court to terminate his parental rights when CYS did not first consider an interstate compact. Father's Brief at 12-13.

First, we note that Father has not provided, and we have not found, any authority that requires CYS to consider or pursue an interstate compact

prior to filing to terminate parental rights. Additionally, there is authority suggesting that an interstate compact is not applicable to this situation.[5] Second, if the Act applies, the evidence clearly demonstrates that Father never sought visitation with Children in Indiana. Had Father requested visitation or had pursued any of the various preliminary requirements for an interstate compact[6] and CYS refused to cooperate, the outcome might be different. However, Father took no steps to seek visitation or even maintain contact with Children. Finally, given Father's lack of cooperation with CYS and his failure to complete his Family Service Plan goals, it is extremely unlikely that a court would have found Father to be an appropriate placement for Children. Given all these factors, it was not error for the trial court to terminate Father's parental rights even when CYS did not explore an interstate compact.

Order affirmed.

_____

[5] 62 P.S. § 752 provides that the Act does not apply to a parent who "receives or brings a child into this Commonwealth for the purpose of giving him a home in the relative's own family." There is no case law interpreting whether this also applies when the child would leave the Commonwealth as in this case. However, there is at least persuasive authority that the Act would not apply. *See McComb v. Wambaugh*, 934 F.2d 474, 481 (3d Cir. 1991) ("The Compact does not apply to parental placements.").

[6] *See* 62 P.S. § 761 (listing notice requirements).

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/2/2015</u>